IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONNA DELOISE MOORE, | ) Case No. 10-2193 SC |
| | ) |
| Plaintiff, | ) MEMORANDUM OF DECISION, |
| | ) FINDINGS OF FACT AND |
| v. | ) CONCLUSIONS OF LAW |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

## I.   **INTRODUCTION**

This case involves injuries Plaintiff Donna Moore ("Plaintiff or Moore") allegedly sustained to her shoulder and cervical spine when employed as a steward aboard a government owned freighter, the CAPE HORN, on December 30, 2008.  ECF No. 1 ("Compl.") ¶ 6.  Moore filed this suit against the United States of America ("Defendant" or "the United States") on May 20, 2010, asserting claims for unseaworthiness, negligence under the Jones Act, and unreasonable failure to provide prompt and adequate maintenance and cure.  Id.

The Court held a six-day bench trial from September 6, 2011 through September 13, 2011.  The Court, by this Memorandum of Decision, issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court concludes that Plaintiff

has proven each of her claims by a preponderance of the evidence.

## II.   FINDINGS OF FACT

### A.   The Parties

1.   Plaintiff Donna Moore is a sixty-three year-old former Chief Steward and Cook who worked the majority of her life at sea, the last ten-plus years on merchant vessels owned by the United States Maritime Administration ("MARAD").  Moore Test.  From 2001 to 2008, she worked as the Chief Steward aboard a MARAD vessel named the CAPE GIRARDEAU, which was docked in Alameda, California on ready reserve status.  Pl.'s Ex. 53; Moore Test.  When the CAPE GIRARDEAU was "laid up" as no longer operational in July 2008, Moore began looking for work aboard another vessel.  Moore Test.  She began working as Chief Steward on the CAPE HORN on December 16, 2008.  Pl.'s Ex. 55-7.  Moore was injured while working aboard the CAPE HORN on December 30, 2008.  Moore Test.  She suffered an aggravation of her injury on November 13, 2009, while working aboard the ALGOL.  Id.

2.   The United States was the owner of the CAPE HORN, a cargo vessel that was berthed in San Francisco on ready reserve status as of December 30, 2008.  Moore Test.; Ryan Test. [1]  The CAPE HORN was a "roll-on, roll-off" cargo vessel used primarily to transport military vehicles.  Ryan Test.  It was moored next to the CAPE HUDSON and was managed and operated by a private operator, Pacific Gulf Marine, Inc ("PGM").  Moore Test.  The United States was also the owner of the ALGOL, a cargo vessel berthed in Alameda

---

[1] Henry Ryan ("Ryan"), MARAD's ship operations and maintenance officer for the west coast of the United States, testified as a defense witness.

2

**United States District Court**
For the Northern District of California

and managed by Maersk Lines.[2]

**B.   Conditions on the CAPE HORN**

3.   While the CAPE HORN was in ready reserve status, it operated with a reduced crew of ten members.  Moore Test.  Moore's duties as Chief Steward included setting menus and preparing three meals per day for the crews of both the CAPE HORN and the CAPE HUDSON, a total of about twenty seamen.  Id.

4.   The dry storage area ("reefer room")[3] of the CAPE HORN was equipped with four rows of large floor-mounted, top-loading freezer boxes.  Pl.'s Exs. 3-8.  The freezers had heavy lids that needed to be held open with large hooks mounted on the ceiling behind each unit.  Pl.'s Exs. 3-8.  Each box was three feet, three inches tall and approximately two feet, four inches deep.  Feitz Test.[4]  The distance from the front edge of each freezer box to the latch for securing the lid in the open position was forty-five inches.  Id.

5.   As part of her duties as Chief Steward, Moore was required to open the freezer boxes several times per day to retrieve food products.  Moore Test.  Moore is five feet, two inches tall.  Id.  Due to her short height relative to the height of the freezer box, Moore needed to stand on something to elevate herself in order to reach down into the freezers.  Id.  In order to open the freezer lids far enough to latch them in the open

---

[2] The parties agreed to this fact.

[3] Defendant's expert witness Kim Estes ("Estes") explained to the Court that seamen refer to the refrigerated storage area as the "reefer room."  The term "reefer" is derived from the abbreviation "Rfr." used to indicate that the area is refrigerated.  Estes Test.

[4] Dale Fietz, a safety engineer, testified as one of Plaintiff's expert witnesses.

**United States District Court**
For the Northern District of California

1 position, she needed to stand on something for elevation and to use

2 an extension -- such as a piece of shelving or a broom handle -- to

3 push the lid all the way into the latched position.  Moore Test.

4        6.    No step-ladders or stepping stools were located in

5 the reefer room or the galley.  Moore Test; Sharik Test.  When

6 Moore began working on the CAPE HORN, an empty plastic milk crate

7 was present on the floor of each aisle of freezer boxes.  Moore

8 Test.  She understood that these crates were to be used as stepping

9 stools when accessing the boxes.  Id.

10       7.    The floor of the reefer room was made of hard

11 ceramic tile.  No rubber matting or non-skid stripping covered the

12 tile.  Pl.'s Ex. 10.  Non-skid stripping was used in the galley

13 room immediately adjacent to the reefer room.  Pl.'s Ex. 16.

14 Although non-skid stripping was not used in the reefer room on the

15 CAPE HORN, non-skid stripping was used in the reefer room of the

16 CAPE HUDSON, which in all other respects was identical to the

17 reefer room on the CAPE HORN.  Jahn Test.[5]

18       8.    Frost and ice accumulated periodically along the

19 bottom edge of the freezer boxes.  Pl.'s Ex. 15.  The frost and ice

20 melted periodically, wetting the tile and making the floor more

21 slippery.  Moore Test.; Fietz Test.

22       9.    Prior to her accident, Moore asked Jahn for a ladder

23 or stool to use in the reefer room because she felt that standing

24 atop a milk crate was unsafe.[6]  Id.  Jahn told her that there used

25

26 [5] Mark Jahn ("Jahn"), Chief Mate of the CAPE HUDSON, testified as a
fact witness for Defendant.

27

28 [6] Moore lived aboard the CAPE HUDSON, which was moored alongside
the CAPE HORN, because she found its cabins more to her liking.
Because she lived aboard the CAPE HUDSON, she had more interaction

to be a ladder in the reefer room but it had been removed after someone fell off of it.  Id.  Moore understood from the conversation with Jahn that she should continue to use the milk crates to stand on when accessing the freezer boxes.  Id.  Moore also told Jahn that non-skid stripping was needed in the reefer room.  Id.  When her complaints were not addressed, she dropped the issue because she did not want to be perceived as a complainer during her first two weeks on the job.  Id.

10.  Moore's duties as Chief Steward did not include procuring safety equipment such as stepping stools or non-skid stripping.  Moore Test; Stoller Test.[7]

11.  PGM was required to obtain MARAD approval before performing major repair or maintenance projects.  Ryan Test.  By contrast, day-to-day preventive maintenance projects of low dollar value, including purchasing a stepping stool or installing non-skid stripping on the floor of a work space, could be undertaken without agency approval.  Id.

12.  The standard of care in the maritime industry calls for maritime employers to conduct job hazard analyses for certain tasks that are to be performed aboard their vessels.  Stoller Test.; Stoller Rep. at 12.  No job hazard analysis was ever conducted regarding the risks of not providing step-ladders in the

_____

with Jahn than with the Chief Mate of the CAPE HORN, Christopher Sharik.

[7] Captain Mitchell Stoller ("Stoller"), a licensed Master with sixteen years of seagoing experience, who has served multiple appointments to federal maritime safety committees and is now a safety consultant to the maritime industry, testified as Plaintiff's expert on maritime safety.  See Pl.'s Ex. 64 ("Stoller Rep.").

reefer room.  Sharik Test.  Sharik does not know whether any such analysis was ever performed regarding the lack of non-skid stripping or rubber mats in the reefer room.  Id.

13.  Dr. Dale Fietz ("Fietz"), Plaintiff's expert safety engineer, conducted tests to determine the coefficient of friction of the tile floor of the reefer room.  Fietz Test.; Pl.'s Ex. 67 ("Fietz Rep.").  A higher coefficient of friction indicates that a surface is more slip-resistant, while a lower value indicates that the surface is less slip-resistant.  Fietz Test.  The Tile Institute's recommended coefficient of friction for a tile floor is .60.  Id.  The floor of the reefer room had a coefficient of friction of .29 when dry and .17 when it became wet from the melting frost on the bottom of freezer units.  Id.

14.  Maritime industry standards provide for a minimum coefficient of friction for ship decks of .50.  Stoller Test.  The standard of care in the industry provides for the use of mats and non-skid stripping on slippery surfaces.  Id.  A ship's captain has the responsibility to ensure that all crew members are provided with the equipment necessary to perform their jobs safely.  Id.

15.  Crista Ali ("Ali") worked as a temporary Chief Steward on the CAPE HORN both before and after Moore's accident.  Ali Test.  She is five feet six inches tall.  Id.  When she worked on the CAPE HORN prior to Moore's accident, she requested a stepping stool but was not provided with one.  Id.  Lacking a stepping stool, she stood atop a plastic milk crate to reach into the bottom of the freezer boxes.  Id.  She also sometimes stood atop a milk crate to open the freezer lids.  Id.  Other times she stood on the floor and used the long handle of a scrub brush to

push the lid into the latched position.  Id.  Officers of the ship witnessed her standing atop milk crates and never told her to stop doing so.  Id.  On one occasion, a crate slipped out from under her as she was attempting to latch a freezer lid in the open position, causing her to bruise her rib cage on the edge of the freezer.  Id.

### C.   **The Accident**

16.  On December 30, 2008, the crews of the CAPE HORN and the adjacent CAPE HUDSON were preparing to move the contents of the freezers on the CAPE HORN to the CAPE HUDSON.[8]  Moore Test.  At 7 a.m. that morning, before beginning the transfer, the Chief Mate, Christopher Sharik ("Sharik") conducted a daily safety meeting with the crew and discussed the potential risks of the project.  Sharik Test.  However, the meeting did not include any discussion of the slipperiness of the tiles or use of step ladders in the reefer room.  Sharik Test.

17.  The crew was going to move the contents of the freezer boxes from one ship to the other, and Sharik told Moore that she needed to instruct the crew where to move the various items.  Id.; Sharik Test.  Sharik testified that he instructed Moore not to move any of the items herself.  Id.  Moore testified that she did not recall this conversation, but that she would have understood such comments to mean she did not need to carry items from the CAPE HORN to the CAPE HUDSON.  She would not have interpreted them to mean that she was prohibited from rummaging through the contents of the freezer boxes in order to determine

---

[8] The crews periodically switched from preparing and eating meals on one ship to preparing and eating meals on the other in order to ensure that both galleys remained in a state of preparedness. Moore Test.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   what was inside them, whether certain items needed to be thrown

2   away, and where certain items should be stored once transferred to

3   the CAPE HUDSON.  <u>Id.</u>  Moving the items in the freezer boxes

4   around, to access items under them for example, was necessary for

5   her to perform the inventory she had been asked to perform and was

6   a regular part of her day-to-day duties.  <u>Id.</u>

7       18.  Moore's accident occurred when she was trying to

8   open and latch one of the freezer units in order to determine its

9   contents so that she could then instruct the crew members what to

10  do with the items inside.  Moore Test.  In order to extend her

11  reach sufficiently to latch the freezer lid, Moore stood atop an

12  upside-down plastic milk crate and used a length of metal shelving

13  to push the lid the forty-five inches required to latch it.  <u>Id.</u>

14  While Moore was attempting to latch the lid, the milk crate on

15  which she was standing slipped on the hard tile deck, causing her

16  to fall into the freezer and the heavy freezer lid to fall and

17  strike her in the back of the neck and shoulder.  <u>Id.</u>  Moore was

18  found in the freezer by Sharik, with only her legs protruding.

19  <u>Id.</u>; Sharik Test.

20       **D.   <u>Plaintiff's Injuries</u>**

21       19.  When the freezer lid fell on Moore, it struck her

22  across her upper back and neck, and caused her to fall into the

23  freezer, striking her shoulder and then falling to her back.  Moore

24  Test.  She immediately felt a stabbing pain in her right shoulder,

25  and defuse pain in her upper back and neck.  <u>Id.</u>  Sharik

26  immediately drove Moore to the emergency room at St. Mary's

27  Hospital in San Francisco.  <u>Id.</u>; Sharik Test.

28       20.  At the emergency room Moore was treated by Dr.

**United States District Court**
For the Northern District of California

Patrick Hand ("Hand").  Pl.'s Ex. 25 ("St. Mary's Med. Rep.").

Moore provided the details of how her injury occurred, and Hand

noted that she was "complaining of pain in her right shoulder,

10/10 with movement, 6/10 when holding still."  _Id._  Following an

X-ray and CT scan, Moore was diagnosed with a "displaced fracture

of the glenoid."  _Id._  She was discharged with pain medication and

a referral to orthopedic surgeon William Montgomery ("Montgomery").

_Id._

    21.  A day or two after her accident, Moore began

experiencing periods of slight tingling in her fingertips.  Moore

Test.  These "spells" did not occur every day, and Moore thought

nothing of them at the time.  _Id._  She had never experienced these

symptoms before her accident.  _Id._

    22.  During her initial examination by Montgomery, the

displaced fracture was confirmed, and Moore was told that she was

going to need surgery.  Pl.'s Ex. 26 ("Jan. 7, 2009 Letter").

Montgomery informed her that she was not fit to continue working as

a steward for the near-term.  Moore Test.  Moore therefore left her

position as Chief Steward of the Cape Horn.  _Id._

    23.  On January 16, 2009, Montgomery performed

arthroscopic surgery on Moore to address a "right shoulder

displaced glenoid fracture, labaral tear, and cuff tear."  Pl.'s

Ex. 27 ("Jan. 16, 2009 Operative Rep.").  The surgery involved a

suture of the labrum, cuff debridement, and fracture repair with

screw fixation.  _Id._

    24.  After surgery, Moore began physical therapy to

rehabilitate her shoulder.  Moore Test.  The therapy sessions

caused the pain in her shoulder to steadily improve.  _Id._  Her back

and neck continued to be tender, and she continued experiencing periodic tingling in her fingertips.  Id.  She wanted very badly to return to work as soon as possible and began asking her doctors to clear her to return to work.  Id.  In late February, her physical therapist noted that Moore reported that she wanted "to go back to work."  Pl's Ex. 30.  On March 25, 2009, Montgomery's assistant noted that Moore was "anxious to return to work."  Pl.'s Ex. 31. On April 15, 2009, Montgomery released Moore to return to work without restrictions but noted that she would need to continue physical therapy for six more weeks.  Pl.'s Ex. 32.

**E.    The Non-Conformity Report**

25.  On January 5, 2009, six days after Moore's accident, Chief Mate Sharik completed an investigation of the accident. Sharik Test.  Upon completing his investigation, Sharik filled out a "Non-Conformity Report" and sent it to PGM.  Sharik Test.; Pl.'s Ex. 24 ("Non-Conformity Rep.").

26.  Under a section of the Non-Conformity Report entitled "Investigation and Findings," Sharik wrote: "A crew member of average height can stand on both feet and reach into the bottom of the box without leaving the deck.  A smaller crew member has to stand on something to gain the height.  A milk crate was used. When the angle of the Stwd's weight shifted the milk crate slipped from under her."  Non-Conformity Rep.

27.  Under a section entitled "Immediate Corrective Actions Taken," Sharik wrote: "Remove milk crates from thaw room. . . . A type of non-skid decking will have to be installed."  Id.

28.  Sharik testified that after the accident "we removed all the milk crates and we actually ordered big wide ergonomic step

10

**United States District Court**
For the Northern District of California

1    ladders."  Sharik Test.

2         29.  On February 25, 2009, a PGM official sent a letter

3    to the Chief Engineer of the CAPE HORN in response to the Non-

4    Conformity Report.  Pl.'s Ex. 24-3.  The letter stated that step

5    ladders should be procured to prevent a similar accident from

6    occurring in the future.  Id.  No other corrective actions were

7    recommended.  Id.

8         30.  Step ladders have since been placed in the reefer

9    room.  Sharik Test.; Ali Test; Pl.'s Ex. 11.

10        **F.   Plaintiff's Return to Work**

11        31.  On April 24, 2009, Moore began working as Chief

12   Steward aboard the ALGOL, a cargo vessel berthed in Alameda and

13   managed by Maersk Lines.  Pl.'s Ex. 55-8.  She continued to have

14   problems with her shoulder and neck.  Moore Test.  In May of 2009,

15   her physical therapist noted that she continued to have "mild" to

16   "moderate difficulty" with various tasks, including opening jars,

17   heavy household chores, and carrying objects weighing over 10

18   pounds.  Pl.'s Ex. 33.  In July 2009, her physical therapist noted

19   she was "extremely compliant," but she was still having "some mild

20   restriction in shoulder range of motion."  Pl.'s Ex. 34.  She was

21   able to complete her steward duties without "undue" symptoms of

22   pain.  Id.  On September 17, 2009, Montgomery noted that Moore

23   still suffered from decreased range of motion, and a marked

24   reduction of grip strength in her injured and dominant right hand.

25   Pl.'s Ex. 35.

26        32.  Once working aboard the ALGOL, Moore continued

27   having stiffness in her neck and began experiencing the numbness

28   and tingling in her fingers more frequently.  Moore Test.  She also

11

began experiencing spasms in her hands at random intervals.  Id.

33.  At first, Moore thought the spasms and tingling might be an indicator that she was working too hard.  Id.  Her job as Chief Steward required lifting heavy pots and pans at times and was physically demanding.  Id.  However, her previous jobs aboard the CAPE HORN and CAPE GIRARDEAU had involved the same duties, and she had never experienced spasms or tingling in her hands on those vessels.  Id.  She began pausing periodically throughout the day to shake her arms and take a deep breath.  Id.  She also purchased an orthopedic pillow and a neck massaging appliance in an attempt to alleviate the symptoms.  Id.

34.  The bouts of spasms and tingling in Moore's hands worsened over time.  Id.  They occurred at unpredictable intervals.  Id.  Some days she would have no symptoms at all, while other days she experienced intense symptoms.  Id.

35.  On November 12, 2009, while lifting a pot, Moore felt a "spring" in her neck and experienced a ringing in her ear.  Moore Test.  She thought nothing of it at the time.  Id.

36.  The next morning, November 13, 2009, as Moore began trying to move food items from storage to the galley, she experienced a loss of control of her hands.  Id.  She was unable to lift anything.  Id.  She went back to her room but was unable to insert the key in the door lock.  Id.  She began to panic, thinking she was having a stroke, and called a friend who worked for MARAD to take her to the emergency room.  Id.

37.  Moore's friend took her to Alameda hospital, where she was diagnosed with an anxiety attack, given medication, and instructed to lie down and rest.  Id.  She returned to her cabin

1   aboard the ALGOL around 8 a.m. and slept until around noon.  Id.

2   When she awoke, her hands were still numb.  Id.  She again phoned

3   her friend and this time was taken to Alta Bates Medical Center

4   ("Alta Bates").  Id.

5          38.  Upon arrival at the emergency room of Alta Bates,

6   Moore was immediately admitted to the hospital.  She was subjected

7   to a series of testing and evaluations, primarily focusing on a

8   neurological problem with her cervical spine and spinal cord.  The

9   report of neurologist Bradley Wrubel ("Wrubel"), who conducted the

10  initial neurological consultation, noted that Ms. Moore had been

11  having her symptoms for about one year, noted that the symptoms had

12  now "become much worse" and noted that Moore complained of "a

13  spasm-type sensation across the neck and shoulders ... associated

14  with significant weakness" and a "burning type paresthesias" in the

15  hands.  Pl.'s Ex. 40.

16         39.  Moore stayed at Alta Bates for several days for

17  testing.  Moore Test.  An MRI revealed damage to her cervical spine

18  consisting of "edema from C3-C7 and cord myelopathy from C4-C7."

19  Pl.'s Ex. 41.  Doctor Gordon Tang ("Tang") recommended that Moore

20  undergo surgery to fuse several vertebrae together.  Id.  Moore was

21  discharged from Alta Bates on November 16, 2009.  Pl.'s Ex. 44.

22         40.  Moore visited her primary care physician Dr. James

23  Yoss ("Yoss") in late November 2009 to seek a second opinion as to

24  whether fusion surgery was necessary.  Moore Test.  She told Yoss

25  that she did not want to have surgery.  Id.  Yoss informed her that

26  her condition was serious and could result in eventual paralysis if

27  not treated.  Id.  Yoss referred Moore to a neurosurgeon, Dr. Brian

28  Andrews ("Andrews") for an examination.  Id.  Andrews evaluated

1   Moore on December 8, 2009.  Pl.'s Ex. 46.  After reviewing the

2   results of nerve conduction studies, Andrews recommended "a simple

3   microsurgical C3 to C7 decompression without fusion."  Id.

4        41.  After weighing the risks, Moore agreed to the

5   surgery recommended by Andrews.  Moore Test.  Andrews performed

6   surgery consisting of C3-C7 "laminectomies and foraminotomies" on

7   February 3, 2010.  Pl.'s Ex. 48.

8        42.  Moore experienced amelioration of her symptoms after

9   the decompression surgery, but she continued to experience numbness

10  in the fingers of her left hand and a raw sensation in the palm of

11  her left hand.  Moore Test.  She related these symptoms to Andrews.

12  Id.; Def.'s Ex. 529.  She nevertheless informed him that she wanted

13  to return to work as soon as possible.  Moore Test.  On May 18,

14  2010, Andrews cleared her to return to work as a steward "on a

15  trial basis."  Andrews Test.; Def.'s Ex. 531.  Andrews informed

16  Yoss that he was permitting Moore to return to work but would

17  continue to "monitor and document her further neurological recovery

18  by seeing her in eight further weeks."  Def.'s Ex. 531.  He noted

19  that she still complained of some numbness in her hand but that the

20  numbness was "modest" and "partial."  Id.

21        43.  After being cleared by Andrews to return to work,

22  Moore visited the office of her former union, the Seafarers

23  International Union ("SIU"), to obtain a "fit for duty" slip.

24  Moore Test.  She was informed that she needed to phone the SIU

25  headquarters.  Id.  Upon calling the SIU headquarters, Moore was

26  informed that SIU doctors would not clear her to return to work.

27  Id.  Shortly thereafter, on June 10, 2010, Moore received a letter

28  from Dr. Kenneth Miller of the SIU informing her that she had been

given the status of "Permanently Not Fit for Duty."  Pl.'s Ex. 50.

44.  Plaintiff was "devastated" upon learning that she would no longer be allowed to work as a merchant seaman.  Moore Test.  She has felt depressed ever since.  Id.; K. Moore Test.[9]

45.  Moore visited Andrews for a follow-up appointment on March 8, 2011, approximately one year after her decompression surgery.  Def.'s Ex. 530.  Andrews noted that "[s]he continues to have some numbness in the LEFT hand and both hands are aching to a degree.  She denies any neck pain."  Id.  He stated that he would provide a "prescription for hand therapy if this is really all that can be offered for her residual hand complaints.  She's not a candidate for further diagnostic tests or invasive treatments."  Id.

46.  Moore again visited Andrews on August 4, 2011.  Def.'s Ex. 542.  Andrews noted that since the March 2011 visit, Moore "has been increasingly troubled by spasms which occur in the hands."  Id.  The spasms were occurring several times per week, lasting up to twenty minutes at a time, and occurred in addition to the continued numbness in her fingertips and burning sensation in her left hand.  Id.  In a letter to Plaintiff's counsel, Andrews stated "I must believe that the patient's symptoms of hand spasms are related to her spinal cord which was decompressed along with the cervical nerve roots back in February 2010."  Id.  Andrews noted that he believed the spasms "will persist indefinitely into the future and it will afflict her quality of life[,] and any potential gainful employment might be compromised by the fact that

---

[9] Moore's daughter, Kelly Moore ("K. Moore"), testified as to her mother's current difficulties.

United States District Court
For the Northern District of California

she has these spasms[.]" <u>Id.</u>

47.   Andrews, a neurosurgeon with extensive expertise in the area of neuro-trauma, and Plaintiff's treating physician for nearly two years, testified that the genesis of Moore's continuing hand spasms and numbness was the trauma to her spine caused by the lid of the freezer box striking her aboard the CAPE HORN.  Andrews Test.  Andrews testified that Moore may have had an underlying degenerative condition in her spine, but he found it improbable that her current symptoms would have arisen without trauma to her cervical spine such as that which resulted from the accident on the CAPE HORN.  <u>Id.</u>  He testified that spasms of the type Moore has endured are a "very common" reaction to spinal trauma.  <u>Id.</u>  He further explained that it was typical that her symptoms worsened as she engaged in increased physical activity by returning to work. <u>Id.</u>

48.   Andrews further testified that, given Moore's current symptoms, it would be unsafe for her to resume work requiring manual labor, as her spasms could cause her to drop anything she happened to be carrying.  <u>Id.</u>  Moreover, jobs that involve repetitive use of the arms could cause her condition to worsen.  <u>Id.</u>  He testified that Moore was in "excellent health" with the exception of her spinal injury.  <u>Id.</u>  Andrews was not retained by Plaintiff as an expert and formed his opinions based on his treatment of Moore's injuries.  <u>Id.</u>

49.   Dr. Victor Prieto ("Prieto"), an orthopedic surgeon at St. Francis Memorial Hospital in San Francisco, was retained by Defendant to offer an opinion as to the cause of Moore's symptoms. Prieto Test.  He met with Moore for "at most" thirty minutes.  <u>Id.</u>

16

He opined that she has probably suffered from a degenerative, asymptomatic spinal condition for years and that the trauma to her neck from the freezer accident most likely rendered her condition symptomatic.  Id.

## G.   **Plaintiff's Current Condition**

50.  Plaintiff currently experiences spasms in her hands at unpredictable intervals "a couple times" per week.  Moore Test. They cause her fingers to curl up and/or spread apart and freeze in such positions.  Id.; Ex. 69 (photos of hands during spasms).  The spasms are extremely painful with the pain extending into the forearms.  Moore Test.

51.  Moore has exhausted all of her savings, and her home is in foreclosure.  Moore Test.  She has filed for bankruptcy because she is unable to pay her remaining medical bills.  Id.  She is fearful of her medical and financial future and greatly misses her career as a ship steward.  Id.; K. Moore Test.

## H.   **Damages**

52.  As of June 10, 2010, Moore has been deemed permanently not fit for sea duty.  Pl.'s Ex. 50.  Based on vocational testing results, Moore's age, and Moore's education level, Vocational Rehabilitation Counselor Carol Hyland ("Hyland") opined that Moore could probably find employment in a customer service position.  Hyland Test.  Hyland opined that Moore would probably earn between twelve and fifteen dollars per hour and that she was more likely to find a part-time position than a full-time position.  Hyland Test.; Pl.'s Ex. 65 ("Hyland Rep.").

53.  Taking into account Moore's background, education, age, and gender, statistical work life tables regularly relied on

in the field of economics predict that Moore will work until age 67.2.  Moss Test.

54.   Moore's annual earning capacity if she were to continue working as a Chief Steward would be $76,571.  Moss Test.[10]

55.   Moore sustained losses, net of taxes and reduced to present value, of the following amounts:

a.   Past lost earnings to time of trial of $109,284.  Pl.'s Ex. 66 ("Moss Rep.").

b.   Future lost earnings, assuming part-time work at $15 per hour, of $168,830.[11]  Moss Test.

56.   Plaintiff has unpaid medical bills in the amount of $26,009.27.  Pl.'s Ex. 57.

57.   In May 2010, Moore began receiving $1688 per month in social security benefits.  Def.'s Ex. 548.

58.   As of July 1, 2010, Moore began receiving disability pension benefits from the SIU in the amount of $376.88 per month. Id.

59.   Moore received the standard $8.00 per day maintenance payments as provided in her union contract from the date of her injury on December 31, 2008 until she returned to work aboard the ALGOL in April 2009.  Def.'s Ex. 509.

60.   Moore has not received maintenance payments from the date she stopped working aboard the ALGOL on November 14, 2009

---

[10] Plaintiff's economist Joanna Moss ("Moss") testified at trial as to Moore's economic damages.

[11] This figure assumes Plaintiff will work until age 67.2.  It also assumes, based on Hyland's testimony, that Plaintiff will require six months of retraining during which she will earn no income, and that she will then work half-time at a wage of fifteen dollars per hour.

United States District Court
For the Northern District of California

until she was cleared by Andrews to return to work on a trial basis on May 18, 2010.[12]  She seeks maintenance payments for this period equal to $8 per day for 185 days, a total of $1480.

61.  By virtue of being allowed to live aboard the ship and eat all meals aboard the ship, Moore enjoyed approximately $8,000 per year ($25 per day) in "found" benefits while working as a chief steward.  Moss Rep.  According to Moss, Plaintiff has suffered a past and future loss of these benefits totaling $64,015. Id.

## III. CONCLUSIONS OF LAW

This case for personal injury damages against the United States by a seaman employed on a MARAD vessel presents an admiralty and maritime matter within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and is governed by the provisions of the Clarification Act, 50 U.S.C. Appx. § 1291(a), which incorporates the provisions of the Suits in Admiralty Act (SIAA), 46 U.S.C. §§ 741-752.

Plaintiff asserts claims for unseaworthiness, negligence under the Jones Act, and unpaid maintenance and cure.

### A.  Unseaworthiness

A "warranty of seaworthiness" is a strict liability doctrine that requires shipowners to furnish their crew with a vessel, and appurtenances thereto, which are reasonably fit for their intended use.  Mitchell v. Trawler Racer, 362 U.S. 539, 550 (1960).  The burden of proving the unseaworthiness of a vessel rests with the

---

[12] The parties agreed that Moore has not received maintenance payments since leaving the ALGOL.

**United States District Court**
For the Northern District of California

seaman plaintiff.  Ramos v. Matson Navigation Co., 316 F.2d 128,
131 (9th Cir. 1963).  The plaintiff must also prove that the
vessel's unseaworthiness was the proximate cause of his injuries.
Id.

Here, the record is replete with evidence that the reefer
space was not fit for its intended use.  The hard tile surface did
not meet the maritime industry's standards or the Tile Institute's
standards for skid resistance.  No rubber matting or non-skid
stripping was in place on the reefer room floor.  The floor was
often wet due to the thawing of ice and frost that frequently
accumulated along the bottom of the reefer boxes.  The Non-
Conformity Report noted that a smaller crew member, such as
Plaintiff, "has to stand on something to gain the height" necessary
to reach items at the bottom of the freezer boxes.  Nevertheless,
no step-ladders were provided for the reefer space despite requests
from both Moore and Ali.  Based upon these findings, the Court
concludes that the reefer space was not fit for its intended use
and was therefore unseaworthy.

Defendant contends that even if the reefer room was
unseaworthy, the unseaworthiness was not the proximate cause of
Plaintiff's injuries.  Rather, Defendant contends that Moore's
accident was simply and wholly the result of her own negligence.
The Non-Conformity Report and PGM's letter in response to it belie
this argument.  They indicate that step ladders and non-skid
stripping would likely have prevented the accident.  The testimony
of Fietz and Stoller further supports this conclusion.

Furthermore, the Court rejects Defendant's argument because it
finds that Moore was not negligent at all.  The Court finds

credible Moore and Ali's testimony that they requested step ladders and were not provided with them.  It was not within Moore's job duties as Chief Steward to procure safety equipment.  The Non-Conformity Report indicates that shorter crew members "ha[d] to" stand on something to access the freezer boxes.  The Court finds that Moore did not act unreasonably under the circumstances by using the only means available to her to perform an act that she was ordered to perform.

The Court also rejects Defendant's contention that Moore disobeyed a direct order by attempting to access the items in the freezer.  Even if Sharik instructed Moore that she was not to move the items, the Court finds that Moore's interpretation of this instruction -- that it was not meant to prohibit her from touching items in the freezer boxes in the course of performing the inventory that she had been ordered to perform -- was reasonable under the circumstances.  Accordingly, the Court finds that Moore was not negligent and that the unseaworthiness of the CAPE HORN proximately caused Moore's accident.

The Court further finds, based on the testimony of Andrews as Moore's treating physician, that the accident on the CAPE HORN was the medical cause of the symptoms that have rendered her permanently unfit for duty.  The Court notes that even Prieto, Defendant's medical expert, opined that Moore likely had a preexisting degenerative spinal condition, but that it was likely the freezer lid striking her head and neck that rendered the condition symptomatic.

Based on these findings, the Court concludes that Defendant is liable for unseaworthiness.

**B.   <u>Negligence under the Jones Act</u>**

The courts have long held that seamen are "the wards of admiralty," and have liberally implemented their personal injury remedies to foster seamen's protection.  <u>Cortez v. Baltimore Insular Line, Inc.</u>, 287 U.S. 367, 377 (1932).  Following this long-honored public policy in favor of seamen, the United States Congress in 1920 created the Jones Act negligence cause of action.

The elements of a Jones Act negligence claim are: duty, breach, notice, and causation.  <u>Ribitzki v. Canmar Reading & Bates, Ltd. P'ship</u>, 111 F.3d 658, 662 (9th Cir. 1993).  "The employer of a seaman owes the seaman a duty under the Jones Act to provide the seaman with a safe place to work."  <u>Id.</u>  For the same reasons the Court found the reefer room unseaworthy, the Court finds that Defendant breached its duty to provide Moore with a safe place to work.  Moore has therefore proved the first two elements of her negligence claim.  The next element of her claim is notice.  An employer is only liable under the Jones Act if the employer or its agents either knew or should have known of the dangerous condition, in this case the slipperiness of the reefer room floor and the lack of any stepping stools in the area.  The Court finds that Defendant knew of these dangers because both Moore and Ali voiced concerns to ship personnel.  Lastly, under the Jones Act's "featherweight causation standard," Moore must demonstrate only "that [her] employer's negligence played any part, even the slightest, in producing [her] injury."  <u>Ribitzki</u>, 111 F.3d at 664, 662 n.3 (9th Cir. 1993).  The Court finds that Defendant's negligence in failing to provide Moore with a safe work space easily surpasses this slight causation standard.

1    Lastly as explained above, the Court finds that no comparative

2    fault applies because Moore was not negligent.

3         **C.    Primary Duty Rule and Discretionary Function Doctrine**

4         Defendant asserts that the "discretionary function exception"

5    and the "primary duty rule" preclude a finding of liability in this

6    case.  The Court disagrees.

7         The discretionary function exception is a qualification to

8    the general waiver of sovereign immunity granted by the Federal

9    Tort Claims Act.  Earles v. United States, 935 F.2d 1028, 1030 (9th

10   Cir. 1991).  The Ninth Circuit has held that the exception applies

11   to the SIAA as well.  Id.  The exception states, in relevant part,

12   that a claim cannot be maintained against the United States when

13   that claim is "based upon the exercise or performance or the

14   failure to exercise or perform a discretionary function or duty on

15   the part of a federal agency or an employee of the Government,

16   whether or not the discretion involved be abused."  Id. (quoting 28

17   U.S.C. § 2680(a)).  Defendant argues that Plaintiff's suit falls

18   within the exception because decisions involving the maintenance of

19   reserve fleet vessels "are classic discretionary functions."  ECF

20   No. 41 ("Def.'s Trial Br.").  Thus, according to Defendant, the

21   government's waiver of sovereign immunity in the SIAA does not

22   extend to the instant action.

23        The government bears the burden of proving that the

24   discretionary function exception applies.  GATX/Airlog Co. v.

25   United States, 286 F.3d 1168, 1174 (9th Cir. 2002).  The government

26   must show that the challenged conduct -- here the failure to

27   provide a safe reefer room -- involved some judgment, and that the

28   judgment is the kind that the doctrine was designed to shield,

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  namely judgment subject to policy analysis.  Id.  Here, the Court

2  finds that the government has not shown that the decision not to

3  install non-skid stripping or rubber mats, and not to provide step-

4  ladders in the reefer room of the CAPE HORN involved judgment based

5  on policy analysis.  The facts show that the lack of safety

6  features in the reefer room was not due to a considered judgment or

7  reasoned analysis at all.  Rather, it was due to the lack of any

8  such judgment or analysis, as no job hazard analysis or risk

9  assessment of the steward's tasks in the reefer room was ever

10  performed at all.  Moreover, simple maintenance tasks such as

11  purchasing a step ladder or installing non-skid stripping did not

12  require agency review.  There is simply no evidence that such

13  measures were subject to policy analysis.

14      The "primary duty rule," established in Walker v. Lykes

15  Brothers S.S. Co., 193 F.2d 772 (2d Cir. 1952), holds that a seaman

16  who is injured as a result of his own breach of a duty to the

17  shipowner to maintain a safe ship cannot recover for injuries

18  caused by such breach.  Reinhart v. United States, 457 F.2d 151,

19  153-54 (9th Cir. 1972).  The rule does not apply here because the

20  evidence shows that it was not Moore's duty as Chief Steward to

21  purchase equipment for the reefer room such as stepping stools,

22  rubber mats, and non-skid stripping.  Therefore, in no way was

23  Moore's injury the result of her breaching any duty she owed the

24  shipowner.

25      **D.   Maintenance and Cure**

26      Under the doctrine of "maintenance and cure," a seaman who

27  becomes ill or injured while in the service of his vessel is

28  entitled to a per diem stipend for the cost of food and lodging on

24

**United States District Court**
For the Northern District of California

land during the period of his or her convalescence, as well as payment for all medical expenses incurred.  Vaughan v. Atkinson, 369 U.S. 527, 531 (1962).  The shipowner's obligation to pay maintenance and cure extends during the period when the seaman is medically unfit to do a seaman's work and continues until he reaches maximum medical recovery.  Id.  "Maintenance" is a daily stipend due to a seaman during the period of his disability equivalent to the quality and value of food and lodging provided to him aboard the vessel.  McWilliams v. Texaco, Inc., 781 F.2d 514, 517 (5th Cir. 1986).  "Cure" is defined as the reasonable medical expenses for treatment until the seaman is fit for duty or until maximum recovery is reached.  Vella v. Ford Motor Co., 421 U.S. 1, 5 (1975).  All ambiguities as to maintenance and cure benefits are resolved in favor of the seaman.  Id.

The record shows that Plaintiff received maintenance for her period of convalescence from December 31, 2008 until she returned to work in April 2009.  She now seeks maintenance from November 13, 2009, the date she left the ALGOL, through May 18, 2010, the date Andrews released her to return to work on a trial basis.  She also requests cure in the amount of her remaining unpaid medical bills. The Court finds that Plaintiff is entitled to the maintenance and cure she seeks.  The record shows that she received medical treatment for her spinal injury from November 13, 2009, through May 18, 2010.  She is therefore entitled to maintenance and cure during this 185 day period.

**E.   Damages**

Based on the above findings, the Court concludes that Plaintiff is entitled to the following damages, net of taxes and

**United States District Court**
For the Northern District of California

reduced to present value:

1. Past lost wages in the amount of $109,284;

2. Future lost wages in the amount of $168,830;

3. Past pain and suffering in the amount of $150,000;

4. Future pain and suffering in the amount of $50,000;

5. Maintenance payments totaling $1,480;[13]

6. Cure in the amount of $26,009.27;

7. Pre-judgment interest in the amount of four percent per annum from the date Plaintiff filed this suit.  46 U.S.C. § 30911(a).

The Court finds that Plaintiff is not entitled to recover for lost "found" benefits equal to the value of her free lodging and meals aboard the ship.  The parties agreed that Defendant was not required to provide her with these benefits while the ships were moored.  Allowing Plaintiff to recover for the loss of these perks would allow her to augment her recovery purely based on Defendant's generosity in allowing her to live aboard the vessel rent-free.

The Court also finds that Defendant is not entitled to a credit for past or future Social Security or SIU pension benefits Plaintiff has received or will receive.  See United States v. Hayashi, 282 F.2d 599, 603-604 (9th Cir. 1960) (government tortfeasor not entitled to credit for Social Security benefits received by plaintiff); Russo v. Matson Navigation Co., 486 F.2d 1018, 1021 (9th Cir. 1973) (improper to consider maritime pension benefits in mitigation of damages owed to injured seaman).

///

---

[13] This amount is based on the union-negotiated rate of $8 per day for a period of 185 days.

**IV. <u>CONCLUSION</u>**

For the foregoing reasons, the Court finds in favor of Plaintiff Donna Moore and against Defendant the United States on Plaintiff's claims for unseaworthiness, negligence under the Jones Act, and maintenance and cure.  The Court awards Plaintiff damages in the amount of $505,603.27 plus interest at the rate of four percent per annum from the date this suit was filed until the date of this Order.

Within ten (10) days of this Order, the parties shall stipulate to the amount of interest owed and file the stipulation with the Court.

IT IS SO ORDERED.

Dated: September 22, 2011          

UNITED STATES DISTRICT JUDGE